IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

CHRISTOPHER U. HALL       *

     Plaintiff,       *

v.       *       CIVIL NO.: WDQ-04-2846

      *

ROGER J. SULLIVAN, *et al.,*       *

     Defendants.       *

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Christopher U. Hall has sued Roger J. Sullivan, Esq., Mark Devan, Esq., DiPaula & Sullivan, LLC, and Covahey, Boozer, Devan & Doore, LLC ("CBDD"), for legal malpractice. Pending are the parties' cross-motions for summary judgment. For the following reasons, the Defendants' motion will be granted, and Hall's motion will be denied.

I. Background

In 1998, Hall retained Sullivan at CBDD[1] to represent him in the purchase and financing of Smoothie King franchises in Boston, Massachusetts, Greensboro and Wilmington, North Carolina, and Columbia, South Carolina. Compl. ¶ 9. For tax and liability purposes, Sullivan recommended that Hall form a corporation to

---

[1] Sullivan left CBDD in the summer of 2000 to open DiPaula & Sullivan, LLC, but continued to represent Hall until 2003.

serve as the Columbia Smoothie King franchise (the "Columbia SK") franchisee, and promised that the initial franchise-related documents would be structured to preserve Hall's interests by allowing him to become the owner of the franchise if necessary. *Id.* ¶¶ 9-14.

Hall appointed his associate, Ryan Beck, to operate the Columbia SK on his behalf, and with Beck formed Rybek, Inc. ("Rybek"), to purchase the franchise. *Id.* Hall contends that Sullivan and Devan, a colleague at CBDD, prepared and reviewed the franchise agreement documents, but erroneously directed Smoothie King Franchises, Inc. ("SKFI"), to award the Columbia SK to Beck, not Rybek, by designating Beck as the franchisee in the Columbia SK Franchise Agreement, as well as in the valuable Area Development Agreement, which provided exclusive development options in the Columbia area. *Id.* ¶¶ 13-16; Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") Ex. 22 (the "Franchise Agreement"); Defs.' Mem. Ex. 24 (the "Area Development Agreement").

As part of the initial transaction, Hall also executed the Guaranty Agreement with SKFI, by which he guaranteed the obligations of the Columbia SK franchisee under the Franchise and Area Development Agreements, and became bound to the non-compete and confidentiality provisions of those agreements. Defs.' Mem.

Ex. 23 (the "Guaranty Agreement").[2]  The Columbia SK opened for business in February 1999.  Compl. ¶ 18.

In 2001, Sullivan negotiated a termination of Hall's agreements with SKFI for the undeveloped Massachusetts and North Carolina franchises.  *Id*. ¶ 20.  The June 15, 2001 Mutual Termination Agreement, prepared by Sullivan, terminated the agreements and released the parties from claims and obligations related to the Boston and Wilmington franchises.  Defs.' Resp. to Pl.'s Cross Mot. for Summ. J. ("Defs.' Resp.") Ex. 11 (the "Termination Agreement").  Hall alleges that, by executing the Termination Agreement under Sullivan's advice, he unknowingly surrendered his right to become the Columbia SK franchisee and sue for any disputes relating to that franchise.  Compl. ¶ 20.

Hall alleges that in 1999, Sodexho USA ("Sodexho"), the University of South Carolina's ("USC") food service provider, contracted Rybek to open two Smoothie King franchises on the USC campus in Columbia.  *Id.* ¶ 19.  But Hall avers that, in 2001, Sodexho entered into a conflicting agreement with SKFI by which Sodexho, not Rybek, would open the on-campus franchises.  Id. ¶ 21.  Believing that the SKFI-Sodexho agreement violated his contract with Sodexho and the exclusive development rights of his franchise, Hall sought to block the agreement.  *Id.* ¶ 25.  On

_____

[2] The Guaranty Agreement also bound Hall to the obligations of the franchisee of the proposed franchises in Wilmington. Guaranty Agreement 1.

Hall's behalf, Sullivan sent Sodexho and SKFI a series of "cease and desist" letters threatening legal action and seeking to negotiate a settlement. *Id.* Hall claims that these letters, sent despite Sullivan's alleged knowledge that Hall could not gain standing as the Columbia SK franchisee, foreclosed a settlement that would have yielded Hall sizable royalties. *Id.* ¶¶ 30-32.

Hall alleges that, in 2003, he finally learned that he could not obtain control of the Columbia SK without SKFI's consent, which was not forthcoming, and thus he lacked standing to pursue various causes of action against SKFI and Sodexho. Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. 14, 22 ("Pl.'s Resp.") Ex. B ¶ 15 (Hall Decl.). Unable to bring suit against SKFI or Sodexho, Hall sued the Defendants for legal malpractice.

II.  Discussion

A.  Standards of Review

1.  Summary Judgment

Under Rule 56(c), summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Only "facts that might affect the outcome of the suit under the governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Thus, "the judge must ask . . . whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.  The court must also view any inferences drawn from the underlying facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A plaintiff must present affirmative evidence of a genuine issue that requires trial. *Anderson,* 477 U.S. at 257.  The mere existence of a "scintilla" of evidence is insufficient to preclude summary judgment. *Id*. at 252.

2.  Legal Malpractice

Hall demands relief for legal malpractice under two counts, one in tort (Count 1) and the other in contract (Count 2).  In Maryland, "a legal malpractice claim is always at once both contract and tort." *Montgomery County, Md. v. Jaffe, Raitt, Heuer & Weiss, P.C.,* 897 F. Supp. 233, 237 (D. Md. 1995) *citing*

*Baker, Watts & Co. v. Miles & Stockbridge*, 95 Md. App. 145, 189 n.11 (Md. Ct. Spec. App. 1993).  Whether an action for professional malpractice is brought in tort or in contract, the plaintiff must prove a negligent breach of duty to establish liability.  *Mumford v. Staton, Whaley and Price,* 254 Md. 697, 708 (1969), *see also Flaherty v. Weinberg,* 303 Md. 116, 134 (1985).  The Court thus evaluates Hall's two counts under the same legal standard for attorney negligence.

In Maryland, "a plaintiff must prove the following elements to recover against an attorney in negligence: (1) the attorney's employment;[3] (2) his neglect of a reasonable duty; and (3) loss to the client proximately caused by that neglect of duty."  Flaherty v. Weinberg 303 Md. 116, 128 (1985) *citing Kendall v. Rogers*, 181 Md. 606, 611-12 (1943).  "In order to be a proximate cause, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause."  *Atlantic Mut. Ins. Co. v. Kenney,* 323 Md. 116, 127-28 (1991).

"Expert testimony as to the relevant standard of care is necessary in an attorney malpractice case, except in those cases where the common knowledge or experience of laymen is sufficient to allow the fact finder to infer negligence from the facts."  *Franch v. Ankney,* 341 Md. 350, 357 n.4 (1996) (*citing Hooper v.*

---

[3] This first element establishes the existence of a duty owed by the attorney to the client. *Ferguson v. Cramer*, 349 Md. 760, 765 (1998).

*Gill*, 79 Md. App. 437, 441, *cert. denied*, 317 Md. 510 (1989), *and cert. denied*, 496 U.S. 906 (1990)).  "In malpractice cases where expert testimony is required, such as this case, summary judgment is proper when a plaintiff's expert testifies at deposition that a defendant's conduct was not a breach of the standard of care, regardless of the expert's initial conclusions concerning certain conduct."  *Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 138 F. Supp. 2d 695, 701 (D. Md. 2001) (*citing McCoy v. Hatmaker*, 135 Md. App. 693, 714-15 (Md. Ct. Spec. App. 2000); *Tatum v. Gigliotti*, 80 Md. App. 559, 569 (Md. Ct. Spec. App. 1989), *aff'd*, 321 Md. 623 (1991); *Mastalski v. Int'l Bus. Machines Corp.*, 974 F.2d 1331, 1992 WL 207789, at *5 (4th Cir. 1992)).

B.  Analysis

   Hall demands $17 million in damages for the Defendants' legal malpractice.  Compl. ¶¶ 33, 38, 42.  He alleges that the Defendants are liable for:

   (1) preparing and advising Hall to execute the initial
       Columbia SK franchise documents that failed to preserve
       his rights to: (a) become the Columbia SK franchisee;
       and thus (b) have standing to sue SKFI and Sodexho for
       Columbia-SK-related claims;

   (2) preparing and advising Hall to execute the Termination
       Agreement that released SKFI from: (a) its obligation

to allow Hall to become the Columbia SK franchisee; and
(b) liability for any of Hall's past or future
Columbia-SK-related claims;

(3) charging Hall unnecessary attorney's fees to pursue
    meritless claims against SKFI and Sodexho; and

(4) destroying Hall's opportunity to settle his claims
    against SKFI and Sodexho by making meritless settlement
    demands to them in a series of threatening letters.

1.  The Initial Columbia Franchise Documents

Hall alleges that the Defendants breached the applicable
standard of care by "negligently failing to investigate the
relevant facts, and by failing to review and prepare documents
which preserved Hall's rights to ownership of the [Columbia SK]
and Hall's rights to sue [SKFI] with respect to disputes related
to the [Columbia SK]." Compl. ¶¶ 37, 41.

As part of the plan for Hall to invest in the Columbia SK
and two similar but unrealized deals in Wilmington and
Greensboro, North Carolina, Hall and the Defendants set up three
corporations that would become the respective franchisees.
Rybek, the corporation intended as the Columbia SK franchisee,
was initially wholly owned by Beck.  Hall's investment in the
franchise was protected by a security interest in Beck's stock in
Rybek and by warrants that, if exercised, would make Hall the

majority stockholder in Rybek.  Defs.' Mem. Ex. 2 at 1; Pl.'s Resp. Ex. E at 1 (the "Letter Agreement").

Franchise Agreement § 15.1 requires SKFI's "express prior written consent" as a condition to the transfer of an interest in the agreement, the franchise, or the franchisee.  Area Development Agreement § 8.1 contains a similar condition.  To bypass this condition, and protect the value of Hall's collateral in the Columbia SK and other franchise investments, Sullivan had Hall and SKFI execute the July 10, 1998 Letter Agreement, which: (1) recognized Hall's interest in the intended franchisee corporations; and (2) pre-approved the transfer of each franchise to Hall in the event of a default by the respective franchisee. In the Letter Agreement, SKFI approves the "corporate structure, loan security and beneficial interest of Mr. Hall in the respective corporate entities," and confirms:

> [I]n the event of any default by the Franchisees of their obligations under either the area [sic] Development Agreement or the Franchise Agreement, that [SKFI] will, prior to exercising and of its rights upon said default, allow Mr. Hall a right of first refusal to cure said default(s) and to replace said defaulting Franchisee and thereafter fulfill the terms of said defaulting Franchisee's Area Development Agreement and Franchise Agreement.

Letter Agreement 2.

The Columbia SK Franchise Agreement lists Beck, not Rybek, as the franchisee.  Franchise Agreement 1.  But the Franchise Agreement permits an individual franchisee like Beck to transfer the franchise and his interest in the agreement to a corporation

9

without SKFI's approval, provided that the transferor-individual
franchisee is a majority owner of the transferee-corporation's
voting power.  *Id.* § 15.2.  Hall alleges that when he exercised
his warrants in April 2002, making *Hall* the majority shareholder
in Rybek, Beck had yet to transfer his franchise interest to the
corporation.  Pl.'s Resp. 10.  Because Beck was no longer the
majority owner of Rybek, he lacked SKFI's consent under the
agreements to transfer his franchise rights to the corporation,
and Hall's mechanism for obtaining the franchise rights by
controlling Rybek was frustrated.[4]

The Defendants contend that Hall has failed to produce
evidence that they breached the applicable standard of care in
structuring Hall's investment and security interest in the
Columbia SK.  Hall's own expert witness on this issue, David
Cahn,[5] testified at deposition that the Defendants' structure was
neither unreasonable nor a breach of the standard of care, but
rather failed to protect Hall's interests because it was not
properly implemented:

---

[4] Hall and the Defendants agree that, in the event of a
default by the Columbia SK franchisee, the Letter Agreement still
allowed Hall to cure any default and become the franchisee prior
to SKFI exercising any of its remedies.  Pl.'s Mem. 3, Defs.'
Mem. 6.

[5] Hall's other expert witness, Sherman Cohn, does not
consider himself a witness on business entity formation or
franchise law, and Hall has not offered any testimony from him to
establish the Defendants' negligence in structuring Hall's
investment in the Columbia SK.  Defs.' Resp. Ex. 13 at 33-35.

Q. Now, in the rebuttal report, you conceded that the structure employed for this transaction where Hall was a secured lender and a consultant to the franchisee, rather than a direct franchisee, would have been a reasonable structure if it was properly implemented, yes?

A. Yes.

Q. So your criticism is not that the structure of the proposed transaction was such that it was outside the range of reasonable or breached standards of care, but rather that the structure was not properly implemented.

A. Correct.

Def's Mem. Ex. 8 at 81-82.

As a matter or law, Hall's expert testimony fails to establish that the Defendants breached the standard of care in their review and preparation of the Franchise and Area Development Agreements, the Letter Agreement, and other documents creating the structure of Hall's investment in the Columbia SK. *Royal Ins. Co. of Am.*, 138 F. Supp. 2d at 702-03 (*citing Anderson*, 477 U.S. 242).


2.   The Termination Agreement

Although Hall argues that the "scope of protection[]" of his interests in the Columbia SK provided by the Letter Agreement was insufficient, he also alleges that Sullivan "should have understood the central role it would play in protecting [his] investment and interest in the [Columbia SK]."  Pl.'s Mem. 3. Hall contends that, because of Sullivan's malpractice in negotiating the Termination Agreement with SKFI, and advising him

to execute that agreement, SKFI was released from its obligation under the Letter Agreement to let Hall become the Columbia SK franchisee.  The Defendants contend that the scope of the release provisions in the Termination Agreement does not include the Columbia SK franchise or SKFI's obligations in the Letter Agreement.

a.  Louisiana Law of Compromise Construction

The parties to the Termination Agreement stipulate that it is a "compromise termination agreement and mutual release of claims" and agree that its terms are to be construed under Louisiana Law.  Termination Agreement 1, § 8.A.

"Transactions" or "compromises" are governed by Louisiana Civil Code articles 3071-3083.[6]  Article 3073, "Scope of Transaction," provides:

> Transactions regulate only the differences which appear
> clearly to be comprehended in them by the intention of the
> parties, whether it be explained in a general or particular
> manner, unless it be the necessary consequence of what is
> expressed; and they do not extend to differences which the
> parties never intended to include in them.
>     The renunciation, which is made therein to all rights,

---

[6] Article 3071 defines a "*transaction* or *compromise*" as "an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing."  La. Civ. Code Ann. art. 3071 (1981).  "Under the Civil Code, the terms *transaction* and *compromise* are synonymous." *Brown v. Drillers, Inc.,* 630 So.2d 741, 747 n.6 (La. 1994) (emphasis added).

12

claims and pretensions, *extends only to what relates to the differences on which the transaction arises*.

La. Civ. Code art. 3073 (1994) (emphasis added).

"[A] compromise is a written contract" and "is governed by the same general rules of construction applicable to contracts." *Brown v. Drillers, Inc.*, 630 So.2d 741, 748 (La. 1994). "In applying the rule of construction set forth in [article] 3073, courts are guided by the general principle that the contract must be construed as a whole and in light of attending events and circumstances." *Id*. (citation and internal quotation marks omitted).

"The meaning and intent of the parties to a written instrument, including a compromise, is ordinarily determined from the four corners of the instrument, and extrinsic (parol) evidence is inadmissible either to explain or to contradict the terms of the instrument."[7]   *Id*.  "When . . . a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation

---

[7] Louisiana courts make a "special exception to the extrinsic evidence rule for compromise agreements" when there is "some substantiating evidence of mistaken intent . . . establishing either (1) that the releasor was mistaken as to what he or she was signing, even though fraud was not present; or (2) that the releasor did not fully understand the nature of the rights being released or that the releasor did not intend to release certain aspects of his or her claim." *Id*. at 748-49.  As Hall's intent not to release Smoothie King from its obligations under the Letter Agreement matches the Court's construction of the scope of the release in the Termination Agreement, this exception does not apply.

is answered as a matter of law." *Id*. at 749-50.

b.  Construction of the Termination Agreement

The parties to the Termination Agreement are SKFI, Hall, and Olaf Turpin, whom Hall had arranged would run the proposed Wilmington franchise.  Termination Agreement 1.  The introduction to the agreement lists the following disputed agreements:

> (1) a franchise and an area development agreement granting Hall the right to develop Smoothie King franchises in the Boston, Massachusetts, area (the "Boston Agreements");

> (2) a franchise and an area development agreement granting Turpin the right to develop Smoothie King franchises in the Wilmington area (the "Wilmington Agreements"); and

> (3) the Guaranty Agreement "under which Hall guaranteed, among other obligations, Turpin's obligations under the [Wilmington Agreements]."

*Id*.  The introduction then states: "No Smoothie King® units have been developed under *the above-mentioned agreements*, and *certain disputes have arisen as to obligations arising under such agreements*."  *Id*. (emphasis added).  The agreement then states that the parties agree to the termination of the Boston and Wilmington Agreements, the payment to Hall of $65,000, and a list of "Post-Termination Obligations" of Hall and Turpin under "the

14

above mentioned agreements," related to trademark usage, the

return of operations manuals, and covenants not to solicit or

compete.  *Id*. §§ 1-4.

The next section of the Termination Agreement then describes

the "Mutual Release of Claims."  *Id*. § 5.  Subsection 5(B)

provides:

> [T]he Franchise Parties release and forever discharge the
> SKFI Parties of and from any and all past, present, and
> future claims, demands, obligations, actions and causes of
> action at law or in equity, . . . that arise out of or
> relate to the franchise relationship, the development or
> operation of *any franchised unit*, the sale of any franchise,
> or any franchise or development agreement between Franchisor
> on the one hand, and Hall and/or Turpin on the other hand.

Termination Agreement § 5(B) (emphasis added).  The "SKFI

Parties" are defined as including the "Franchisor," who is

defined earlier in the agreement as SKFI.  *Id*. § 5(A)(1).  The

"Franchisee Parties" are defined as "Chris Hall and Olaf Turpin,

and each of their heirs, executors, administrators, trustees,

agents, partners, business entities, attorneys, insurers,

successors and assigns."  *Id*. § 5(A)(2).

Hall argues that the release in subsection 5(b) was either

intended to apply to the Columbia SK, or its application to the

Columbia SK "was a 'necessary consequence of what is expressed'

in the Termination Agreement."  Pl.'s Mem. 4 (*citing* La. Civ.

Code art. 3073 (1994)).  Hall contends that the agreement does

not limit the term "any franchised unit" to the undeveloped

franchises in the Boston or Wilmington areas, because "the

15

parties had to understand the [Columbia SK] would be impacted" by
the Termination Agreement.  *Id*. at 4-5.  Hall also argues that an
exception to SKFI's release of Hall for his "continuing
obligations" under the Guaranty Agreement "respecting his
guaranty of obligations under various Smoothie King® area
development agreements and franchise agreements executed by Ryan
Beck" demonstrates that the scope of the release included the
Columbia SK.  Termination Agreement § 5(F); Pl.'s Mem. 5.  Hall
contends that "[t]here would be no need for SKFI to insist on
this carve out unless it was clear that the releases in the
Termination Agreement otherwise included the [Columbia SK]."
Pl.'s Mem. 5.

The Court finds that when the Termination Agreement is
construed as a whole, Hall's broad construction of the
compromise's release in subsection 5(B) is not evident.  The
introduction of the agreement makes clear that "the differences
on which the transaction arises" are the "disputes hav[ing]
arisen as to obligations arising under" the Boston and Wilmington
Agreements, and Hall's guaranty of Turpin's obligations in the
Guaranty Agreement.  La. Civ. Code art. 3073 (1994); Termination
Agreement 1.  Under article 3073, the scope of compromise
"extends only to what relates to the differences on which the
transaction arises."  La. Civ. Code art. 3073 (1994).  The
Termination agreement does not contemplate any disputes or

differences related to the operation or ownership of the Columbia SK, the Columbia SK Franchise and Area Development Agreements, or the Letter Agreement. *See Brown*, 630 So.2d at 757 ("differences which the parties do not intend to settle are unaffected by a compromise agreement").

Moreover, in the one place where the Columbia SK and its respective agreements are directly mentioned, the Termination Agreement provides that Hall's covenant not to compete under the Guaranty Agreement will not apply to the Columbia SK's territory if Hall "directly become[s] the franchisee." Termination Agreement § 5(F). A similar release from the non-compete provision appears in § 4(E) for "any Smoothie King® unit to which Hall is a party (directly or as a guarantor)."

Hall's contention that the term "any franchised unit" contained in the release includes franchises not covered by the Boston or North Carolina Agreements does not fit with a complete reading of the Termination Agreement or with article 3073's scope limitation "*to the differences on which the transaction arises*." There is no implication in the agreement of an intent to limit Hall's rights related to the Columbia SK franchise, nor was a release of SKFI's obligation in the Letter Agreement a "necessary consequence" or resolving the disputes over the planned Boston and Wilmington franchises or Hall's related obligations in the Guaranty Agreement.

The Guaranty Agreement is the only disputed agreement in the Termination Agreement that is related to the Columbia SK, because under it Hall also guaranteed Beck's obligations under the Columbia SK Franchise and Area Development Agreements.  It follows that the only obligations contained in one of the disputed agreements that did not relate to the Boston or Wilmington franchises would require an exception from the release, and that SKFI's obligations in the Letter Agreement, which was not a disputed agreement, would not require such an exception.

Construing the evidence intrinsic to the compromise as a whole, the Court finds that the parties of the Termination Agreement did not intend its release provisions to include Halls's rights related to the Columbia SK or SKFI's obligations under the Letter Agreement.  If Hall has suffered by failing to gain legal control of the Columbia SK franchise, that loss was not caused by any release of claims or obligations under the Termination Agreement.

3. Attorney's Fees for Pursuing Meritless Claims

Hall alleges that the Defendants are liable in negligence for "charging Hall attorney's fees incurred to pursue and allege claims against Sodexho and [SKFI], despite the fact that Sullivan knew or should have known that such claims were without merit *due*

*to the previous mistakes he had made with respect to the*
*franchising documents and by allowing Hall to execute the*
*Termination Agreements.*"  Compl. ¶¶ 37, 41 (emphasis added).

Hall has failed to show that the Defendants were negligent
in preparing the initial franchise documents, and the Termination
Agreement did not cause the loss of Hall's right to become the
Columbia SK franchisee and sue for Columbia-SK-related claims.
As Hall does not argue any other reasons why the Defendants knew
or should have known his claims against SKFI or Sodexho were
without merit, he fails to state a claim for negligent charging
of attorney's fees.

4.  Loss of Settlement Proceeds from Sodexho or SKFI

Hall alleges that the Defendants "impair[ed] and ultimately
destroy[ed] any opportunity for Hall to settle his claims against
SK and/or Sodexho by making outrageous and meritless settlement
demands in a series of 'cease and desist' letters."  Compl. ¶¶
37, 41.

Assuming *arguendo* that the Defendants were negligent in
making the "outrageous and meritless settlement demands" of
Sodexho and SKFI, and that Hall had a valid claim, Hall is still
required to prove causation and damages, and to do so he must
produce some evidence that, but for the Defendants' negligence,
Sodexho and SKFI would have settled his claims.  *See Royal Ins.*

19

*Co. of Am.,* 138 F. Supp. at 706-08 (to prove causation and damages, plaintiff must show that the outcome of settlement negotiations would have been different but for his attorney's malpractice); *Thomas v. Bethea* 351 Md. 513, 532 (1998) ("A lawyer cannot be held liable for not having held out for a settlement that could not have been achieved in any event.").

Hall avers in the Complaint that "Richard Leville, Vice President of [SKFI,] . . . told Beck that if Sullivan had not interfered with Sodexho[,] . . . then Sodexho and SK would have offered Hall a deal of 17% of gross sales for the contracted period of 15 years with renewables for Hall's fair share of the deal." Compl. ¶ 32.  Hall gives no further mention of Leville's alleged statement in the arguments of his pleadings, no testimony that the statement was made, nor any other evidence to support his allegations that SKFI or Sodexho would have offered to settle his alleged claims but for the Defendants' alleged malpractice.


III.  Conclusion

For the reasons stated above, Hall has failed to present affirmative evidence to sustain his allegations that: (1) the Defendants breached the standard of care in structuring his initial investment in the Columbia SK; (2) the Defendants were negligent in charging him attorney's fees to pursue his alleged claims against SKFI and Sodexho; or (3) SKFI or Sodexho would

20

have settled his alleged franchise-related claims against them but for the Defendant's negligent conduct.  Furthermore, the scope of the release in the Termination Agreement prepared by the Defendants did not affect Hall's right to become the Columbia SK franchisee and sue for franchise-related claims, and thus the Defendants' preparation of that agreement could not have caused the alleged loss of Hall's interest in the Columbia SK.  Without evidence to sustain the allegations underlying Hall's claims, judgment as a matter of law for the Defendants is appropriate. *Anderson,* 477 U.S. at 257; *Celotex Corp.,* 477 U.S. at 322. Accordingly, the Defendants' motion for summary judgment will be granted, and Hall's motion for summary judgment will be denied.

December 7, 2006              _____/s/_____
Date                          William D. Quarles, Jr.
                              United States District Judge